RUMSEY, et al. *against* LOVELL.

If, in representing the credit and character of a merchant, the party alleges that to be true, which he knew to be false, or fraudulently conceals what he ought to have revealed, an action for the consequential damages will lie against him.

In such an action, other similar representations, made by the defendant to other persons, may be given in evidence.

Books called for by a party, and produced, do not become evidence by his merely inspecting them without asking questions about them.

In an action for a false representation of character, the defandant may give his own character in evidence.

THIS was a special action on the case, for knowingly and deceitfully asserting and affirming to the plaintiffs, that one Crowell was a person of credit, and worthy to be trusted, whereby the plaintiffs were induced to sell him, on credit, a large quantity of goods; whereas, in fact, the said Crowell was not a person of credit, nor worthy to be trusted, by reason whereof the plaintiffs sustained damage, &c.

Plea, not guilty.

It appeared in evidence, that on the 10th of October, 1807, Crowell called on the plaintiffs to make a purchase, and referred them to the defendant for his character and credit as a merchant; that, upon the plaintiffs' application to the defendant on this subject, he declared that Crowell was a man of good credit; that he had been but a short time in business; that he was unincumbered with debts; (except as to a debt of about 3,000 dollars due to him;) that he would trust him to any reasonable amount; and that the plaintiffs might safely trust him.

The plaintiffs' counsel, in order to show a fraudulent connection between Lovell and Crowell, offered to show that the defendant had given, about the same time, the same recommendation to various other persons. This was objected to by the defendant.

VAN NESS, J. The testimony is admissible. *Allison* v. *Matthieu*, (3 Johns. Rep. 235,) is in point.(1)

The plaintiffs' counsel then called for the books of the defendant, to inspect the account between Lovell and Crowell. The defendant produced them, and the plaintiff, after inspecting them, refused to read them in evidence; and the court decided, that he had a right to inspect them, and that they did not thereby become evidence in the cause. But that if a person, calling for books, asks any questions of a witness in explanation of any item in the books, they are then in evidence, and the opposite party may read them to the jury.(2)

---

(1) In *Beal* v. *Thatcher*, (3 Esp. Cases, 193,) which was also an action on the case for giving a false character *per quod*, &c., the same question occurred. Erskine, for defendant, objected to the admissibility of the evidence on the ground that it was "*res inter alios acta*," and introduced into the cause a new issue between the defendant and a third person. But Lord Kenyon admitted the evidence, on the ground, assumed by the counsel for the plaintiff in this case, that it went to prove a subsisting fraudulent connection between the defendant and the party trusted. In *Snell et al.* v. *Moses*, (3 Johns. 235,) similar testimony was admitted on the same ground.

(2) This point does not appear to be exactly settled in the books. The decisions in England are contradictory. In *Sayer* v. *Kitchen*, (1 Esp. 209,) the defendant having given notice to the plaintiff to produce his books, they were produced, and, after inspection by the defendant, he declined offering them in evidence. The plaintiff insisted that the defendant having called for the books, he thereby made them evidence. But Lord Kenyon ruled that it

The plaintiffs proved further, that when the defendant recommended Crowell to them, he held a bond and warrant of attorney, executed in his favor by Crowell; that they were dated on the 29th of August, 1807; that the penalty of the bond was 14,000 dollars, conditioned for the

did not made them evidence ; that if the counsel on one side called for the other's books, and made no use of them, it was only matter of observation to the counsel on the other side, that the entries therein were in favor of his client, but did not entitle him to use them as evidence. In the case, however, of *Wharam* v. *Routledge*, (5 Esp. Cases, 235,) Lord Ellenborough held a different doctrine. In that case, the defendant's counsel called for a book referred to by a witness for the plaintiff. It was answered by the plaintiff's counsel, that they should have the book, provided it was then to be received in evidence. The defendant's counsel requested to see it first. Lord Ellenborough : "You cannot ask for a book, of the opposite party, and be determined upon the inspection of it, whether you will use it or not. If you call for it, you make it evidence for the other side, if they think fit to use it."

This question came before the supreme court of this state, in the case of *Lawrence* and *Whitney* v. *Van Horne* and *Clarkson*, (1 Caines, 276,) and the court were divided in opinion. Radcliff, J., was of opinion, that as the notice to produce a paper, requires it to be produced in evidence, that when once called for and produced, it became evidence of course, and could not be called for on any other terms. That neither the court, nor the party could enforce its production for the mere purpose of inspection. Thompson, J, was of opinion, that the rule laid down by Lord Kenyon, in *Sayer* v. *Kitchen*, was founded in good sense, and best calculated to answer the ends of justice. That the party calling for a paper, had a right to inspect it, and then make his election whether he would read it in evidence or not. In the case of *Kenny* v. *Van Horne* and *Clarkson*, (1 Johns. 385,) this point was again brought into discussion, and seems to have undergone a more deliberate investigation than in any former case. Spencer, J., in pronouncing the opinion of the court, adopts the reasoning of one of the counsel, who contended that the notice to produce papers was analogous to a bill in chancery for a discovery, where the answer would be evidence only for the adverse party. That on account of the expense and delay attending bills of discovery, the practice of calling for papers had been introduced, and consequently ought to be governed by the same rules. That it would be unreasonable and unjust, to make a paper evidence, because it was called for. The most injurious

payment of 7,000 dollars; that this fact was not disclosed to the plaintiffs by the defendant. Crowell absconded about the 12th of November. On the 11th of November, judgment was entered up on the said bond, and a *fi. fa.* issued; the contents of Crowell's store were sold on the same

consequences might result from such a rule of evidence. This question, however, cannot, perhaps, be considered as settled by this case; the decision having rested ultimately on other grounds, and the opinion, above stated, is placed under an *ut semble*, by the reporter. The rule, however, is so consistent with good sense and sound policy, that I presume there can be but little doubt of its adoption, when the question comes solemnly before the court. There is another difficulty connected with this subject, which it may be advisable to note in this place. There has been a considerable fluctuation of opinion among the judges in England, upon the question, how far a paper, produced under a notice, is evidence without further proof. Lord Mansfield was of opinion, that the party calling for it need not prove it when produced, but might at once read it in evidence. *Thompson* v. *Jones*, B. R. 18; G. 3; *Passal* v. *Goodal*, M. 1782, cited in *Rex* v. *Middleroy*, 2 Durnf. and East. 42. This opinion, when attempted to be extended to third persons, was strongly opposed by Lord Kenyon, who declared that nothing but a solemn judgment of the house of lords, would ever persuade him of the correctness of the rule.

Mr. Peake, in his treatise on evidence, considers Lord Mansfield's opinion as unobjectionable, where a party to the instrument produces it on such notice, as he must know whether he executed such an instrument or not. Peake Ev. 109. The latest decision in the court of K. B., on this subject, is the case of *Gordon* v. *Secretan*, 8 East. 548. There the instrument produced at the trial under notice, appeared to have been executed by the party producing it and third persons, and was attested by subscribing witnesses And it was held by Lord Ellenborough, and the whole court, that the production of it, in this manner, did not dispense with the necessity of proving it by the subscribing witnesses, although unknown before to the party calling for it. In *Wethuston* v. *Edgington*, (2 Camp. 94,) this decision was adhered to, and was considered as extending as well to instruments not under seal, as to those under seal. Heath, J., however, says, the old rule was the sensible one, that an instrument coming from the opposite party was *prima facie* to be taken, to be duly executed. In *Pearce* v. *Hopper*, in the common pleas, (3 Taunton, 60,) Mansfield, C. J., admits the authority of *Gordon* v. *Secretan*, but considers the case of a plaintiff producing a deed, under which he holds

day, at private sale, under the direction of the defendant, for 6,000 dollars, of which 2,900 dollars were paid to Lovell.

The defendant's counsel, in the opening of the defence, offered testimony as to the defendant's character, for integrity, &c. This was objected to by the plaintiffs' counsel. But the court admitted the testimony, and said, that the defendant, by entering into evidence of his character, gave the plaintiffs a right to offer testimony to impeach it.(3)

an estate, as an exception to the rule. Vide, Phillips' Law of Ev. 343. The rule, therefore, in England, is general, requiring proof of the instrument, whether produced by a party or by a third person; liable, however, like all other rules, to exception.   McKinnon Phil. of Ev. 92.   In *Kenny* v. *Van Horne* and *Clarkson*, (1 Johns. 395,) a bottomry bond had been produced at the trial upon a notice, and had been read in evidence without further proof. Upon this subject, Spencer, J., observed, "I must not, however, be understood, as sanctioning the course adopted at the trial, in admitting the paper to be read without proof, because notice had been given to produce it, and it had been called for and perused."   The objection to the rule, as established in England, is, that the party who calls for the instrument from the opposite side, is ignorant of the name of the attesting witness, and therefore cannot come prepared to prove it.   It is suggested by Mr. Campbell, in his Ni. Pri. Cases, (2 vol. 95,) that this may be obviated by obtaining a rule of court, or a judge's order, to inspect the instrument before the trial.

Since the preceding note was written, the courts of common law, both here and in England, (sometimes with the aid of statutes, and sometimes by the exercise of their own inherent jurisdiction,) have extended, to suitors, such plenary powers of inspecting the books and papers of their opponents before the trial, and of coercing their production at the trial, that the use of the notice and the law connected with it need be but seldom resorted to. The diligent attorney will always be prepared on this subject, and the law of this note will be appealed to only in cases of hurry or surprise.   2 R. S. 199, sec. 23 ; Cod. Proc. sec. 388.

(3) The accuracy of this decision is questionable; it would seem to imply that a party might, in every case, volunteer testimony of his general good character ; at the peril merely of encountering testimony to impeach it from

The defendant then proved, that the bond and warrant of attorney had been given to him, by Crowell, to secure him from the debts of a former partnership in which Crowell had been engaged, and which, upon the dissolution of that partnership, he had agreed to pay, and against which

the opposite side. This certainly is not the correct rule; it would tend to screen a party, when particular fraud was charged against him. That this species of testimony, is not admissible of course, appears manifest from the opinion of Lord Kenyon, in *King* v. *Francis*, 3 Esp. 116. That was an action for criminal conversation, and the defendant's counsel, on the cross-examination of the plaintiff's witnesses, attempted to impeach the plaintiff's character, by showing that he was a dissipated person, but failed. The plaintiff then offered witnesses in support of his character. The admissibility of this evidence was opposed by the defendant's counsel. Lord Kenyon would not allow the evidence to be received; he observed that it was true, in general, that at trials at *nisi prius*, the character of the parties, on the record, was not matter to be examined into by evidence; that though the cross-examination of the plaintiff's witnesses had been directed to impeach the character and conduct of the plaintiff, he did not think that authorized him to break through the rule, by going into evidence of character, which stood unimpeached. If the general character of the party is put in issue by the very proceeding itself, then it is a fair subject of inquiry on both sides. Peake Ev. 7; 1 Johns. 52. Thus, in an action of *crim. con.*, the husband, by bringing the action, having put the wife's general character and behavior in issue; the defendant, in mitigation of damages, may give in evidence particular facts of the wife's adultery with others, or her lewdness before marriage. *Elsam* v. *Francis*, 1 Esp. Cases, 562; Buller N. P. 296; 1 Johns. 52. But when a particular fraud is imputed to a party, general evidence of character is inadmissible. *Doe ex dem. Stephenson* v. *Walker*, 4 Esp. 50. In ejectment by an heir at law, to set aside a will for fraud and imposition committed by defendant, he shall not be permitted to call witnesses to prove his general good character. *Goodright ex dem. Furo* v. *Hicks*, cited Buller, 296. To this rule, however, there are exceptions. Thus, when witnesses to a will are dead, and it is impeached on the ground of fraud in procuring it, and that fraud is imputed to the deceased witnesses, evidence may be called to their characters. 4 Esp. 50. So, in the great case of *Joliffe's will*, (1 Bl. 365,) witnesses were examined, as to the character of the person by whom the will was prepared, and the legality of that testimony was not doubted. 1 Greenl. on Ev. 61.

Lovell had indemnified Crowell's partner.    He alse offered other testimony rebutting the *scienter.*

VAN NESS, J., ruled, that if the defendant had represented as true, what he knew at the time to be false, or had fraudulently concealed what he ought to have disclosed, that the plaintiff would then be entitled to recover.(4)

The jury found a verdict for the defendant.

*Robinson, Colden* and *Emmet,* for the plaintiffs.

*D. B. Ogden, Wilkins* and *King,* for the defendant.

(4) The law of this case having been the subject of considerable discussion in England, and a great diversity of opinion, as to its accuracy, having prevailed among very able judges and lawyers, an historical review of the cases may be instructive.    The first direct authority, and the leading case on this subject, in the English courts, is the case of *Pasley* v. *Freeman,* (3 T. R. 51,) decided in the year 1789, while Lord Kenyon was C. J.    It is there held that a false affirmation of the credit of a person, made with intent to defraud a third person about to deal with him, is the ground of an action on the case in the nature of deceit, if such third person is thereby induced to trust, and sustains damage.    In that case, Mr. Justice Grose dissented from the opinion of the court: he held that the old writ of deceit, to which this action was said to be analogous, could only be brought against a party to the contract, and when there is a promise, express or implied, that the fact misrepresented is true.    That if the assertion be a nude assertion, it is that sort of misrepresentation, the truth of which does not lie merely in the knowledge of the defendant, but may be inquired into, and the plaintiff is bound so to do, and he cannot recover a damage which he has suffered by his own laches.    The next case is that of *Eyre* v. *Durnford,* (1 East 327,) where the authority of *Pasley* v. *Freeman,* seems to have been unquestioned.    But in the next case, (*Heycraft* v. *Creassy,* 2 East, 103,) Lord Kenyon attempted to extend the doctrine of *Pasley* v. *Freeman,* to all cases of false representation accompanied with damage, although the party making such representation were himself the dupe.    He there expressly held, that the want of criminal intention, in the party making the representation, made no difference, provided the representation was untrue; that the maxim, " *Actus non facit reum nisi mens sit*

Rumsey v. Lovell.

*rea,*" applied only to criminal cases. The other judges, however, overruled this doctrine, and decided that the false representation, to be actionable, must be made "*malo animo;*" and that there must be something more than misapprehension and mistake. In this case, Grose, J., again expressed his dissent to the case of *Pasley* v. *Freeman*: he said he was unable to comprehend the grounds on which that case was decided. In *Tapp* v. *Lee*, (3 Bos. and Puller, 367,) the question came before the common pleas; and the case of *Pasley* v. *Freeman*, was there recognized, Lord Alvanly observing, that after the determination which had taken place, he was bound to hold that such an action would lie; though he much wished the legislature would interfere to restrain such actions, unless the representations were reduced to writing. Chambre, J., in the same case, concurred with Lord Alvanly, in wishing the legislature would interfere, but at the same time remarked, that it was true the action was modern in practice, but that if there had been no decision on the subject, he would think it founded on solid legal principles.

In *Evans* v. *Bucknell*, (6 Ves. Jr. 186,) Lord Chancellor Eldon expresses his decided conviction against these cases. His language is as follows: "As to the case of *Pasley* v. *Freeman*, it is almost improper to say any thing at this day, having a tendency to shake it. I know that Mr. J. Grose, very lately, held the same opinion, as he did at the time of the judgment. The doctrine in that case is, in practice and experience, most dangerous. It will become necessary, in order to protect men from the consequences, that the statute of frauds should be applied to that case. I have always said, when I was chief justice, that I so far doubted the principles of that case, as to make it not unfit to offer, as I always did, to the counsel, that a special verdict should be taken; but that offer was so uniformly rejected, that I supposed I was under some error on the subject. I, therefore, could only point out to the jury the danger of finding a verdict upon such principles, and I succeeded in impressing them, with a sense of that danger, so far, that the plaintiff, in such actions, very seldom obtained a verdict.".

Lord Chancellor Erskine, however, in the case of *Clifford* v. *Brook*, (13 Ves. Jr., 132,) holds the opposite opinion. In speaking of the case of *Pasley* v. *Freeman*, he says: "With regard to that case, a considerable difference of opinion prevails, and some of the most correct judgments appear, to me, to have been surprised. My opinion, on this species of action, does not concur with that of Lord Eldon, as expressed in the case of *Evans* v. *Bucknell*, which opinion, against that action, I know his lordship constantly held in the court of common pleas. The mistake of those who invade the principle of that action consists in this: the proposition is not, that if a man, asked whether a third person may be trusted, answers, "you may trust him, he is a very honest man and worthy of trust;" an action will lie, if he proves

otherwise: there must be the knowledge at the time, that is the sound principle; that the defendant knowing that person to be dishonest, insolvent and unworthy of truth, made the representation. The case of *Pasley* v. *Freeman*, stands upon the clearest principles of jurisprudence, and has no connection with the statute of frauds.

This question came before the supreme court of this state, collaterally in the case of *Ward* v. *Centre*, (3 Johns. 280,) but received no decision from the court. Mr. Justice Van Ness, seems there, however, to hint his disapprobation of the case of *Pasley* v. *Freeman*. The case of *Pasley* v. *Freeman*, he says, seems to have been taken for law; but it never has, to my knowledge, received the sanction of this court. That the principles, on which that decision was made, have been carried far enough, has been admitted, and that this is an action not to be encouraged so long as the provisions of the statute of frauds are considered salutary, I am fully persuaded.

In the case, however, of *Upton* v. *Vail*, (6 Johns. 181,) the case of *Pasley* v. *Freeman* was recognized and sanctioned in the supreme court. One of the points made by the defendant's counsel in that case was, that this action. would not lie, without a memorandum in writing. Kent, C. J., in pronouncing the opinion of the court, says, "In relation to the case of *Pasley* v. *Freeman*, I have carefully examined the reasoning of the judges in that case, and in the subsequent cases, and I profess my approbation of the doctrine on which it was decided. The case was not decided on any new ground; but upon the application of a principle of natural justice, long recognized in the law, that fraud or deceit, accompanied with damages, is a good cause of action. The only plausible objection to it is, that in its application to this case, it comes within the mischief which gave rise to the statute of frauds, and that therefore, the representation ought to be in writing. But this, I apprehend, is an objection arising from policy and expediency; for it is certain, that the statute of frauds, as it now stands, has nothing to do with the case." The same question came again before the court in *Young* v. *Covert*, (8 Johns. 24,) and the court there held the same doctrine, refusing, however, to extend the case, and confining the action to cases of actual fraud, and declaring that the simple fact of false representation, unconnected with fraudulent design, is not sufficient.

The rule, in *Pasley* v. *Freeman*, is applicable also to the case of a fraudulent concealment. *Eyre* v. *Durnford*, 1 East, 317.

From the cases, therefore, above referred to, it follows, that the action for a false representation of character, upon the principle of *Pasley* v. *Freeman*, is sustainable in this state, although it may be doubted, whether the reasoning of Grose, J., in that case, as to its being a mere nude assertion, which the opposite party might inquire into, and therefore, not at all the subject of the old writ of deceit, has ever received a satisfactory answer. Vide 7 Cr. 69.

Rumsey v. Lovell.

It has been correctly observed, that the law of the case of *Pasley* v. *Freeman*; has been supported, in England, only by a constant struggle, and it is, therefore, not at all surprising that the same uneasiness, under the law of that case, should have been infused into the bar, on this side of the Atlantic.

Hence, we find that case again questioned in the supreme court, in 1831, in the case of *Allen* v. *Addington*, 7 Wend. 9. The court, however, again recognized the rule as laid down, by chief justice Kent, in *Upton* v. *Vail*, and the defendant appealed to the court for the correction of errors. The principle established in *Pasley* v. *Freeman*, thereupon, came, for the first time, under the consideration of the court, in the last resort, in the year 1833, and was, in that tribunal, fully sustained and applied to a case of fraudulent *suppressio veri*. Thus carrying the doctrine as far as it had been carried by a series of cases in England. *Addington* v. *Allen*, 11 Wend. 374.

The controversy on this subject, in the English courts, resulted in the statute of G. 4, ch. 14, sec. 6, which provides that no action shall be brought, whereby to charge any person upon, or by reason of any representation or assurance, made or given, concerning or relating to the character, conduct, credit, ability, trade, or dealings of any other person, to the intent or purpose, that such other person may obtain credit, money or goods, unless such representation or assurance be made in writing, signed by the party to be charged therewith.